(303 P.3d 705)

No. 108,315

FIRST NATIONAL BANK OF OMAHA, as successor by merger to FIRST NATIONAL BANK OF KANSAS, *Appellee*, v. CENTENNIAL PARK, LLC, *et al.* (CENTENNIAL PARK, LLC, BRADLEY D. VINCE, RICHARD H. SAILORS), *Appellants*.

Opinion filed March 22, 2013.

*Paul D. Sinclair, Brendan L. McPherson,* and *Miriam E. C. Bailey,* of Polsinelli Shughart PC, of Kansas City, Missouri, for appellants Centennial Park LLC and Bradley Vince.

*R. Douglas Gentile* and *Jeffrey D. Rowe,* of Douthit Frets Rouse Gentile & Rhodes, LLC, of Kansas City, Missouri, for appellant Richard H. Sailors.

*Jennifer K. Vath,* of SNR Denton US LLP, of Kansas City, Missouri, for appellee.

Before ARNOLD-BURGER, P.J., GREEN, J., and HEBERT, S.J.

GREEN, J.: On appeal, the defendants, Centennial Park, LLC, Bradley D. Vince, and Richard H. Sailors, challenge the trial court's summary judgment granted in favor of First National Bank of Omaha as successor by merger to First National Bank of Kansas (FNB). Specifically, the defendants raise four arguments on appeal: (1) that equitable principles should have prevented FNB from accelerating the defendants' loan debt obligation even though FNB was entitled to accelerate the loan under the terms of the promissory note; (2) that the trial court erred when it found that the defendants had not substantially performed under the terms of the loan documents and therefore had committed a material breach of the contract; (3) that FNB waived its right to accelerate the loan debt when it accepted the defendants' late payment of $9,349 by depositing the check in its account; and (4) that FNB breached the implied covenant of good faith and fair dealing when it sent the

defendants a billing statement requiring a principal payment of $1,350,000. We disagree.

First, the equitable principle that the defendants rely on—mistake—does not apply here because there was no mistake made. Second, the trial court correctly held that the defendants had not substantially performed under the terms of the note and the loan documents, and, therefore, had materially breached the contract. Third, FNB did not waive its right to accelerate the loan debt when it accepted the defendants' late payment because the parties' note contained multiple anti-waiver provisions. Finally FNB did not breach the implied covenant of good faith and fair dealing when it sent the defendants a billing statement requiring a principal payment of $1,350,000. Even though the trial court determined that the defendants did not owe a principal payment of $1,350,000 on April 10, 2010, the trial court found that Centennial Park owed an unpaid balance of $176,880.57 on that date. Accordingly, we affirm.

Generally, the underlying facts of this case are undisputed. On May 7, 2008, FNB entered into a loan agreement with the defendants. The defendants wanted this loan to start a commercial real estate development project located on the borders of Johnson County, Kansas, and Jackson County, Missouri. Under the terms of the promissory note (note), FNB agreed to loan the defendants $9,716,600. The note contained the following payment terms:

"(1) Monthly installments of accrued and unpaid interest shall be due and payable on the tenth day of each month commencing with the payment due on May 10, 2008; (2) A principal payment in a minimum amount of $1,350,000.00 on or before April 10, 2010; and (3) A final payment of all unpaid principal and all accrued and unpaid interest shall be due and payable April 10, 2011."

The note was secured by a document entitled "Amended And Restated First Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing" that was signed by the defendants' manager on May 7, 2008. The parties also executed other loan documents that day, including: a construction loan agreement and personal guarantees executed by Centennial Park's managing members, Bradley D. Vince and Richard Sailors. Centennial Park and the guarantors did not negotiate any changes to the documents

previously listed before they were signed by the parties. Under the terms of the construction loan agreement, FNB agreed to release part of its collateral each time lots in the development were sold in exchange for 75 percent of the net proceeds of sale. For more than a year, the parties' relationship continued as planned.

By the end of the second anniversary of the loan, May 7, 2010, the defendants had paid FNB $1,173,119.43 in principal payments. On March 31, 2010, FNB sent Centennial Park an automated invoice statement that indicated a payment of $1,350,000 was required for "Current Principal." After Centennial Park received the statement, defendant Vince, a Centennial Park managing member, contacted FNB's vice president, Christopher Willis, to ask about the statement. Willis told defendant Vince that he was unaware of the statement and that he was surprised such an amount would be due. The next morning, Willis sent an email to defendant Vince's attorney. In the email, Willis changed his position from the previous day. Specifically, Willis stated that his previous recollection on whether a $1,350,000 principal payment was required was "faulty" and he "did not remember this principal reduction payment, but it was clearly required by the terms of the Note."

The defendants failed to make any additional payments on the loan on or before April 10, 2010. Because the terms of the defendants' note required a minimum principal payment of $1,350,000 on or before April 10, 2010, and it had paid only $1,173,119.43, the defendants were in default according to the terms of the note. Although the terms of the note gave FNB the authority to accelerate the loan immediately after default and without notice, FNB did not accelerate the loan debt on April 10, 2010.

On April 23, 2010, FNB received the proceeds of a lot sale in Centennial Park's development project in the amount of $167,531.49. The proceeds brought the defendants' total principal paid balance to $1,340,650.80, which was $9,349 short of the amount that was due on April 10, 2010. On May 17, 2010, FNB sent the defendants a default letter stating that their account was delinquent for its failure to pay $1,350,000 on April 10, 2010. Even so, FNB still did not accelerate the loan then. Instead, FNB told the defendants that they would be allowed to cure the default by

delivering a plan, acceptable to FNB, at its sole discretion, to cure the default on or before May 31, 2010. The letter also told the defendants that FNB would accelerate the loan debt on May 31, 2010, without further notice if the defendants failed to deliver an acceptable plan. Although the defendants offered a plan to cure the default, FNB apparently did not feel that the plan was acceptable, and on June 1, 2010, FNB told the defendants that it was accelerating the loan debt.

On September 17, 2010, defendant Vince's attorney sent FNB's attorney a letter concerning the payment dispute along with a check for $9,349.20. The check represented the difference between $1,350,000 and $1,340,650.80 before FNB accelerated the loan on June 1, 2010. FNB accepted the check and deposited it in its account.

On August 6, 2010, FNB sued Centennial Park and it guarantors, Vince and Sailors. Eventually, defendants Centennial Park, Vince, and Sailors, collectively moved for summary judgment. FNB then filed a competing motion for summary judgment. After the trial court conducted multiple hearings, it granted FNB's summary judgment motion and denied Centennial Park's summary judgment motion. The trial court's final judgment order granted FNB the following: (1) damages of $7,239,654.14 (principal), $550,587.57 (accrued interest), $1,659.087 (per diem interest), and $123,071.62 (attorney fees and costs) against Centennial Park; (2) judicial foreclosure of the Kansas portion of the Centennial Park property; and (3) damages of $7,239,654.14 (principal), $550,587.57 (accrued interest), $1,659.087 (per diem interest), and $123,071.62 (attorney fees and costs) against defendants Vince and Sailors, jointly and severally.

After an additional hearing, the trial court denied defendants Centennial Park, Vince, and Sailors' motion to reconsider.

*Should equitable principles have prevented FNB from accelerating the defendants' loan debt obligation even though FNB was entitled to accelerate the loan based on the terms of the promissory note?*

The defendants first argue that the trial court erred when it refused to prevent acceleration of its loan debt obligation under

equity principles. Conversely, FNB maintains that the undisputed material facts defeat the defendants' equity arguments and that the trial court did not abuse its discretion when it denied the defendants' equity arguments.

The defendants expressly concede in their brief that they technically defaulted on their loan obligation on April 10, 2010: "It was clear error for the district court not to alleviate [the defendants] from this technical default." The defendants' concession is supported by the record on appeal. As mentioned earlier, paragraph three of the note provided that "a principal payment in a minimum amount of $1,350,000.00 [was due] on *or before April 10, 2010.*" (Emphasis added.) Moreover, paragraph seven of the note provided: "This Note shall be in default upon the occurrence of any one of the following events ('Event of Default'): (a) if any payment of principal or interest is not made when the same becomes due and payable."

By April 10, 2010, the defendants had paid only $1,173,119.43 in principal payments. Because the terms of the defendants' note required a minimum principal payment of $1,350,000 on or before April 10, 2010, and they had not paid that amount, the defendants were in default under the note when they failed to pay the amount due on that date. After default, FNB was allowed to accelerate the loan debt obligation under the note's acceleration clause, which stated the following:

"If this Note is in default, then upon and after such default the holder hereof shall have the right, exercisable at such holder's discretion, to declare the entire unpaid principal amount and all accrued interest due hereunder immediately due and payable without notice . . . to the undersigned, and [FNB] shall have all the remedies available to it at law or in equity for the collection of the amounts due. *Failure at any time to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.*" (Emphasis added.)

FNB did not accelerate the loan debt obligation immediately, and on April 23, 2010, FNB received the proceeds of a lot sale in Centennial Park's development project in the amount of $167,531.49. Even so, Centennial Park's proceeds still did not bring its principal payments to the amount required under the note, and after notice from FNB, FNB accelerated the loan on June 1, 2010.

The defendants do not dispute that the terms of the promissory note allowed FNB to accelerate the loan balance after default. Instead, the defendants maintain that FNB should have been prohibited from accelerating the loan under equitable principles. Specifically, the defendants argue that the trial court should have disallowed the acceleration here because of FNB's "accident, mistake, or inequitable conduct." Thus, we must answer the following question: Did equitable principles prevent FNB from accelerating the defendants' loan debt obligation even though it was entitled to accelerate the loan under the terms of the note?

Under Kansas law, "the application of an equitable doctrine rests within the sound discretion of the trial court. [Citation omitted.]" *National City Mortgage Co. v. Ross*, 34 Kan. App. 2d 282, 287, 117 P.3d 880, *rev. denied* 280 Kan. 984 (2005). A judicial action constitutes an abuse of discretion if the action: (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012) (criminal); *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 292, 263 P.3d 767 (2011) (civil). Moreover, an abuse of discretion occurs if discretion is guided by an erroneous legal conclusion or goes outside the framework of or fails to consider proper statutory limitations or legal standards. *O'Brien v. Leegin Creative Leather Products, Inc.*, 294 Kan. 318, 331, 277 P.3d 1062 (2012) (civil); *State v. Woodward*, 288 Kan. 297, 299, 202 P.3d 15 (2009). The party asserting that the trial court abused its discretion bears the burden of showing this abuse of discretion. *State v. Wells*, 289 Kan. 1219, 1226, 221 P.3d 561 (2009).

Generally, courts may invoke equitable principles to relieve a mortgagor from acceleration of the maturity of a debt secured by a mortgage or deed of trust. 59 C.J.S., Mortgages § 681. Even so, courts should use their power to refuse to accelerate the maturity of a debt on equitable grounds sparingly and should refuse to foreclose a mortgage only under certain clearly defined circumstances. 59 C.J.S., Mortgages § 681. When making this determination, courts generally have considered the following factors: (1) the conduct of the parties; (2) the amount paid in reduction of the debt;

and (3) the improvements made on the property by the mortgagor. 59 C.J.S., Mortgages § 681. Courts also may use equity to provide relief to the mortgagor against acceleration where the default results from accident, mistake, or where strict enforcement of acceleration would impose an inconceivable hardship on the mortgagor and give the mortgagee an unconscionable advantage. 59 C.J.S. Mortgages § 681; see also *Greenberg v. Service Business Forms Industries*, 882 F.2d 1538, 1542 (10th Cir. 1989) ("a court in equity can relieve a debtor from the hardship of acceleration based on accident, mistake, fraud, or inequitable conduct of the creditor").

While there seems to be no Kansas precedent involving the defendants' particular argument, Kansas law recognizes similar equitable principles. Specifically, our Supreme Court has stated the following:

"[I]f the default was induced by the fraudulent or inequitable conduct of the creditor, or by any agreement or promise upon which the debtor might rely which operated to mislead or throw the debtor off his guard, a court of equity would interfere to stay proceedings, or the action might be abated upon the facts being properly pleaded." *Snyder v. Miller*, 71 Kan. 410, 421, 80 P. 970 (1905).

When the trial court made its decision below, it adopted the equitable principles listed in *Greenberg*, stating that it had "traced the legal basis in *Greenberg* to its origin, and finds that the accident, mistake, fraud or inequitable conduct of the creditor exceptions to acceleration are sensible."

In the absence of direct authority, we will draw guidance from several factors in determining whether equitable principles should be used to relieve a mortgagor from acceleration after default. The factors are the following: (1) the conduct of the parties; (2) the amount paid in reduction of the debt; and (3) the improvements made on the property by the mortgagor. Moreover, a court should consider whether the default resulted from accident, mistake, or inequitable conduct of the mortgagee. Nevertheless, as stated earlier, courts should use their power to refuse to accelerate the maturity of a debt on equitable grounds sparingly and should refuse to foreclose a mortgage only under limited circumstances.

There was confusion below about the repayment schedule for the note. FNB believed that a lump sum payment of $1,350,000 was due on April 10, 2010. The defendants questioned this payment amount when they received the March 31, 2010, statement. Then, according to defendant Vince's affidavit, Willis told him that he was unaware of any billing for principal reduction and that he was surprised that a lump sum $1,350,000 payment would be due. But Willis changed his position the following day after he was contacted by defendant Vince's counsel, Brandon Ferguson.

In an email sent to Ferguson, Willis stated the following:

"Brandon,

"I am in meetings this morning. However, I will forward to you a copy of the Amended and Restated Promissory Note. My recollection on this question was faulty. I did not remember this principal reduction payment, but it is clearly required by the terms of the Note. We will get the copy of the Note to you today.

"Chris Willis."

When the default occurred, FNB interpreted the loan documents to require a full $1,350,000 payment, not a payment of $1,350,000 less lot sale proceeds to date. On the other hand, the defendants contended, and the trial court later agreed, that the loan documents as a matter of law required the latter (a payment of $1,350,000 less lot sale proceeds to date), leaving an unpaid amount due of $176,880.57 on April 10, 2010. In later briefing and bankruptcy court litigation, FNB accepted the trial court's ruling. Nevertheless, FNB pointed out that the defendants had failed to pay the shortfall amount of $176,880.57. Moreover, FNB noted that the defendants had presented no evidence that FNB had hindered them from making that payment.

The defendants assert that they did not make the $176,880.57 payment because they disagreed with the automated billing statement. Nevertheless, the automated monthly billing statements did not waive the requirements of the note. The parties expressly agreed in the note that any waiver must be signed by the holder. Moreover, the note also stated in the middle of page 2 that FNB would simply "attempt" to notify the borrower of amounts due,

but "the failure to give such notice will not affect the obligation of the undersigned to pay the principal and interest due."

The trial court summarized the billing statement in this way:

"And there just simply isn't any evidence that anything the bank did, even the 3/31/10 billing statement . . . There is just no reason to believe that what the bank did resulted in the default. *And that's where the law is. So there is no basis for the application of an equity defense preventing acceleration in this case.*" (Emphasis added.)

Equity cannot excuse Centennial Park's failure to pay because none of the equitable principles that it relies on are present here, as the trial court ruled that, notwithstanding the various asserted defenses, no basis existed for the application of an equity defense preventing acceleration in this case. Moreover, the trial court pointed out that "[t]here is no evidence of an honest endeavor in good faith on the part of the defendant to pay that amount of money on 4/10/10."

Further, Centennial Park's classification as a commercial entity also supports the position that equity should not be invoked here. As a commercial entity, Centennial Park was in a better position than a consumer would have been in a similar situation. *Cf. Medling v. Wecoe Credit Union*, 234 Kan. 852, 678 P.2d 1115 (1984) ("It cannot be denied that the more sophisticated debtor is in a better position to grapple fairly with the creditor . . . ."). Indeed, as a commercial entity, Centennial Park could have negotiated terms more favorable to it.

The record does not indicate that the defendants made any attempt to pay the amount that it believed it owed. For instance, the defendants could have done any of the following: tendered the $176,880.57 to FNB while informing them that it was disputing the $1,350,000 lump sum payment; placed the $176,880.57 in escrow until it resolved the payment dispute; or filed suit and offered the money to the court until the dispute was decided. The defendants did not take any of these actions.

Because Centennial Park failed to pay the amount due of $176,880.57 by April 10, 2010, the trial court properly rejected the use of its equitable powers to prevent the acceleration of the defendants' loan balance.

*Did the trial court err when it found that the defendants had not substantially performed under the terms of the loan documents and therefore had committed a material breach?*

Under the principles of contract law, the doctrine of substantial performance provides that a party's performance may be considered complete if the essential purpose of the contract is accomplished and that party has made a good-faith attempt to comply with the terms of the agreement even though he or she fails to meet the precise terms of the agreement. *Dexter v. Brake*, 46 Kan. App. 2d 1020, 1033, 269 P.3d 846 (2012). "Substantial performance is the antithesis of material breach. If it [is] determined that a breach is material, it follows that substantial performance has not been rendered. [Citation omitted.]" *Almena State Bank v. Enfield*, 24 Kan. App. 2d 834, 838, 854 P.2d 724 (1998). A material breach is one where the promisee receives something substantially less or different than what he or she bargained for. 24 Kan. App. 2d at 838.

Kansas courts commonly characterize substantial performance as a fact question. 24 Kan. App. 2d at 838. But, as with other fact-based issues, we may determine if a contractual party has substantially performed under the contract when the relevant circumstances are undisputed. See, *e.g., St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043 (1989) (proximate cause decided as matter of law on undisputed facts); *Lay v. Kansas Dept. of Transportation*, 23 Kan. App. 2d 211, 215, 928 P.2d 920 (1996) (same), *rev. denied* 261 Kan. 1085 (1997). This *is* such a case.

Substantial performance does not apply if the breach was willful. The defendants' failure to pay all but $176,880.57, which is undisputed, was deliberate. "The doctrine of substantial performance does not apply where the breach is willful. 'The willful transgressor must accept the penalty of his transgression.' " Calamari and Perillo on Contracts, § 157, p. 249 (1970). Moreover, some courts have refused to apply substantial performance when the variation from the contract was intentional, even though the variation was made with good motives. See *Shell v. Schmidt*, 164 Cal. App. 2d 350, 330 P.2d 817 (1958), *cert. denied* 359 U.S. 959 (1959).

Here, the parties agreed in the loan documents to the specific and controlling terms of this commercial development loan. As determined by the trial court, Centennial Park failed to pay the amount due of $176,880.57 by April 10, 2010. The later payment of $167,531.49 from lot sale proceeds on April 26, 2010, was applied to the debt owed, but, under the terms of the loan documents, it did not constitute a partial cure or waiver of the default.

With respect to the defense of substantial compliance and material breach, the trial court relied on *Almena State Bank v. Enfield*, 24 Kan. App. 2d 834, 954 P.2d 724 (1998). The trial court stated:

"*Almena State Bank* case enumerated the factors to consider with substantial compliance, which is a concept that developed in construction law settings. While the Court is reluctant to treat the concept of substantial compliance as a defense in this case because of the history of the concept, it feels obligated to do so. One of the factors for substantial compliance, from *Almena State Bank* is an honest endeavor to perform. The contract before this Court called for a payment of $1.35 million on or before April 10, 2010. *There is no evidence of an honest endeavor to make the full payment of $1.35 million on or before April 10, 2010.* It was not paid. The Court does not believe that there is substantial compliance. The court believes that the failure to pay, whether it is $176,880.57 or $9,349.20 is a modest amount and percentage, and that the law in Kansas on substantial compliance does not analyze the amount of money at issue, but rather, pursuant to the contract, $1,350,000 was due on or before April 10, 2010 and it was not paid."

In the present case, there was no written agreement to allow the defendants a partial payment breach or a right to cure for $176,880.57 or even $9,349.20.

As determined by the trial court and as admitted by the defendants, the full payment of $1,350,000 was not made by April 10, 2010. On May 17, 2010, FNB gave the defendants a 2-week opportunity to present a plan acceptable to FNB before it accelerated the debt. The defendants presented no plan acceptable to FNB.

In short, the defendants' default was willful. The defendants argue that they honestly believed that they did not owe a separate principal payment of $1,350,000. Nevertheless, even if their belief was true, as the trial court later determined, they could not have honestly believed that they had made principal payments totaling $1,350,000 by April 10, 2010. Thus, an excuse of mistake as to what performance the loan documents imposed on the defendants

would not have legally excused them from performing under the loan documents by paying the sum of $176,880.57 by April 10, 2010. Because the deviations from the loan documents were deliberate, the defendants have not substantially performed under the loan documents. As a result, the defendants' substantial performance argument fails.

*Did FNB waive its right to accelerate the loan debt when it accepted the defendants' late payment of $9,349 by depositing the check in its account?*

The defendants next argue that the trial court "erred by failing to find that a check for $9,349 tendered to and deposited by FNB, did not constitute a waiver." FNB disagrees and argues that it did not waive any of its rights and its acceptance of the $9,349 check did not cure the defendants' accelerated debt. "The legal effect of a written instrument is a question of law. It may be construed and its legal effect determined by the appellate court regardless of the construction made by the trial court." *Foundation Property Investments*, 286 Kan. 597, Syl. ¶ 2. Consequently, review of this issue is de novo.

The defendants argue that FNB waived its right to accelerate the note when it accepted the $9,349 late payment. Their argument is flawed. Promissory notes and mortgages are contracts between the parties, and the ordinary rules of construction applicable to contracts apply to them. *Carpenter v. Riley*, 234 Kan. 758, 763, 675 P.2d 900 (1984). Under Kansas law, waiver is an intentional relinquishment of a known right and intention may be inferred from conduct. *Iola State Bank v. Biggs*, 233 Kan. 450, 458-59, 662 P.2d 563 (1983). Generally, a mortgagee's acceptance of a late or partial payment will result in a waiver of the right to declare default and accelerate a debt because of the lateness of that payment. *Postal Savings & Loan Ass'n v. Freel*, 10 Kan. App. 2d 286, 287, 698 P.2d 382 (1984). Moreover, " 'a past practice of excusing defaults occasioned by late payments may under certain circumstances be construed as an implied waiver of an acceleration clause.' " *Foundation Property Investments*, 286 Kan. at 609. But when the unambiguous language of the contract states a contrary

intention, no such inference of waiver can be drawn. *Freel*, 10 Kan. App. 2d at 287. In other words, when the parties' contract contains an unambiguous anti-waiver provision, acceptance of a late payment does not waive a mortgagee's contractual right to accelerate the loan after default.

In this case, the parties agreed to the following provisions in the promissory note:

"If this Note is in default, then upon and after such default the holder hereof shall have the right, exercisable at such holder's discretion, to declare the entire unpaid principal amount and all accrued interest due hereunder immediately due and payable without notice . . . to the undersigned, and [FNB] shall have all the remedies available to it at law or in equity for the collection of the amounts due. *Failure at any time to exercise this option shall not constitute a waiver of the right to exercise the same at any other time.*

. . . .

". . . No delay or omission of the holder of this Note to exercise any right or power hereunder shall impair such right or power or be a waiver of any default or an acquiescence therein. Any single or partial exercise of any such right or power shall not preclude other or further exercises of any other right. No waiver shall be valid unless in writing signed by the holder of this Note and then only to the extent specifically set forth in such writing." (Emphasis added.)

Based on the contract provisions cited above, FNB did not waive its right by accepting the defendants' late payment. Indeed, the clear language of the note provisions italicized earlier constitute anti-waiver provisions. Because FNB and the defendants agreed to these anti-waiver provisions under the terms of the note, FNB's acceptance of the $9,349 late payment did not constitute a waiver of its contractual right to accelerate the debt after the defendants' default.

Moreover, Kansas appellate courts have upheld lenders' contractual rights where their loan documents contained anti-waiver provisions similar to the ones present here. See, *e.g., Riley State Bank v. Spillman*, 242 Kan. 696, 701, 750 P.2d 1024 (1988) (Bank did not waive its right to declare default after accepting late payment because promissory note contained anti-waiver clause: "No waiver by the Secured Party of any default shall be effective unless in writing nor operate as a waiver of any other default or of the same default on a future occasion."); *Freel*, 10 Kan. App. 2d at 287

(Past practice of accepting late payments did not waive party's right to accelerate a promissory note because the note contained an express anti-waiver provision: "Any waiver of any payment hereunder or under the instrument securing this note at any time, shall not, at any other time, be taken to be a waiver of the terms of this note or the instrument securing it."); *Foundation Property Investments*, 286 Kan. at 607 (citing *Phipps v. First Federal Sav. & Loan*, 438 N.W.2d 814 [S.D. 1989]) (mortgage note provision stating "failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default" created an anti-waiver provision indicating that bank's failure to exercise its acceleration option did not constitute a waiver of its acceleration right); *Beneficial Mortg. Corp. v. Gietzen*, No. 104,818, 2011 WL 4357841 (Kan. App. 2011) (unpublished opinion), *rev. denied* November 4, 2011 (mortgagee not prohibited from accelerating debt because mortgage contained anti-waiver provision). Consequently, the defendants' waiver argument fails.

*Did FNB breach the implied covenant of good faith and fair dealing when it sent the defendants a statement requiring a principal payment of $1,350,000?*

Finally, the defendants argue that FNB "breached their covenant of good faith and fair dealing by first issuing the March Statement, and then proceeding to repeatedly demand $1,350,000 when far less was due."

Under Kansas law, "[t]he duty of good faith and fair dealing is implied in every contract, with the exception of employment-at-will contracts." *Estate of Draper v. Bank of America*, 288 Kan. 510, Syl. ¶ 13, 205 P.3d 698 (2009). The duty requires that contractual parties refrain from intentionally doing anything to prevent the other party from carrying out his or her part of the agreement, or from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987). "[W]hether the good faith standard was met is a question of fact. [Citation omitted.]" *St. Catherine Hospital of Garden City v. Rodriguez*, 25 Kan. App. 2d 763, 765, 971 P.2d 754 (1998).

Nevertheless, we may determine whether the implied covenant of good faith and fair dealing was violated as the underlying facts here are undisputed. See *St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043 (1989) (proximate cause decided as matter of law on undisputed facts); *Lay v. Kansas Dept. of Transportation*, 23 Kan. App. 2d 211, 215, 928 P.2d 920 (1996) (same), *rev. denied* 261 Kan. 1085 (1997).

In this case, nothing FNB did hindered the defendants from carrying out their part of the agreement. The billing statement was automated. The May 17, 2010, letter simply stated the uncontroverted fact that the full $1,350,000 payment had not been made. The billing statement accurately reflected the balance that was due by April 10, 2010, under the terms of the note. Consequently, FNB did not breach the implied covenant of good faith and fair dealing, and the defendants' implied covenant of good faith and fair dealing argument fails.

Affirmed.